IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KEVIN P. BRUCE,

    Plaintiff,

v.                                                              Case No. 2:08-cv-371

JOHN E. POTTER, Postmaster General,            JUDGE EDMUND A. SARGUS, JR.
United States Postal Service,

    Defendant.

## OPINION AND ORDER

Plaintiff Kevin P. Bruce brought this Title VII action against Defendant John E. Potter, Postmaster General, United States Postal Service ("USPS"), alleging that Defendant discriminated against Plaintiff on the basis of his sex (male) and race (Caucasian). Plaintiff also alleges that Defendant retaliated against him for having filed a charge with the Equal Employment Opportunity Commission ("EEOC"). This matter is before the Court for consideration of Defendant's Motion For Summary Judgment. (Document 25.) For the reasons that follow, Defendant's Motion is hereby **GRANTED**.

### I.    Background

Defendant employed Plaintiff as a letter carrier from 1989 until 2000, when he was promoted to the position of supervisor. He voluntarily stepped down as a supervisor in 2002 and was then employed as a letter carrier until 2005. He had no disciplinary record until 2003. (Am. Compl. ¶¶ 4–7; Answer ¶¶ 4–7.) Plaintiff alleges that, starting in 2003, he "began to receive unfair discipline" due to his race and gender. (Am. Compl. ¶ 8.) Following the events described below, Plaintiff's employment was terminated by a Notice of Removal dated July 8, 2005. (Mot. Ex. A-1 at 1–2 (Notice of Removal).) The parties presented evidence of the following events leading up to Plaintiff's termination.

For several years, Plaintiff had been romantically involved with Cathy Jakeway, a fellow letter carrier with whom he has an eleven year old son. It appears that their relationship ended in late 2004 or early 2005.

On April 2, 2005, Jakeway filed a telephone harassment complaint with the Whitehall Police Department. The narrative supplement to the complaint, signed by the reporting officer, indicates that Jakeway complained of the following alleged conduct. "Plaintiff follows her while she is on delivery routes" and "leaves strange letters in her work vehicle." Jakeway told Plaintiff that his calls were not welcome and that he was not to call her, but he continued to call her daily, leaving messages containing vulgarities and curses. While Plaintiff had "not made any threats or caused [Jakeway] any physical harm," Jakeway claimed that "the increased frequency of the calls combined with the harassment while she is at work has made Ms. Jakeway fearful for her continued safety. She feels that he is obsessed with her and may become physically harmful due to her continued dismissal of his advances." (Mot. Ex. B-1 (Incident Report), Ex. A-1 at 1 (Notice of Removal).)

On April 4, 2005, Lewis Nimmons, Manager of the Whitehall Carrier Unit, informed the Postal Inspection Service ("PIS") of allegations that Plaintiff had threatened and harassed Jakeway by telephone and on visits to her postal route. He also informed the PIS that Plaintiff and Jakeway had been in a relationship and have a child. (Mot. Ex. B ¶ 5 (Gentile Decl.), Ex. A-1 at 1 (Notice of Removal).)

The PIS independently confirmed that Jakeway had filed the telephone harassment complaint against Plaintiff with the Whitehall Police. (Mot. Ex. B ¶ 6 (Gentile Decl.).)

Also on April 4, 2005, the PIS received a facsimile dated April 1 from Jakeway containing several complaints about Plaintiff's alleged conduct. Jakeway stated that since January 2005, she had asked Plaintiff to leave her alone on several occasions, but he continued to

follow her on her route, carried a firearm when visiting her, left notes in the mail she delivers, and left vulgar voice messages on her phone. She stated that Plaintiff followed Jakeway and a coworker into a restaurant while they were at lunch, made vulgar comments to her, and refused to acknowledge several requests to leave. Jakeway also stated that although Plaintiff and Jakeway are at times cordial, she sometimes feels "unsafe and threatened." When Plaintiff allegedly follows her on her route, Jakeway stated, "each time that I go into the building to make my delivery in the back of my mind I fear that he could stab me with his knife and end it all because I now refuse to give in to what he wants from me." (Mot. Ex. B-2 (Fax Complaint), Ex. A-1 at 1 (Notice of Removal).) According to PIS Inspector Philip Gentile, "Jakeway's allegations were corroborated by statements from USPS employees Steve O'Neal, Trent Simmons, and Donnell Kirksey." (Mot. Ex. B ¶ 8 (Gentile Decl.).)

On April 5, 2005, Inspector Gentile interviewed Jakeway. According to Gentile's declaration, Jakeway "described several incidents during which [Plaintiff's] conduct alarmed her," and stated that Plaintiff has a conceal and carry firearm license and carries a gun around his ankle. (Mot. Ex. B ¶ 10 (Gentile Decl.).) According to the Notice of Removal, Jakeway also recounted during this interview that on November 9, 2004, Plaintiff came to Jakeway's route when he was off-duty and had an altercation with a Postal patron during which Plaintiff bit off the patron's thumb. She stated that Plaintiff pinches her, leaving bruises, and that he had given her a Valentine's Day card picturing a duck and noting, "Wish me a Happy Valentine's Day . . . or the duck is going to die," signed, "love your husband, Kevin Bruce." (Mot. Ex. A-1 at 1–2 (Notice of Removal).)

On April 6, 2005, Inspector Gentile interviewed Plaintiff at his residence. Plaintiff denied Jakeway's allegations and claimed that his visits to her route were made at her request. Plaintiff played a voicemail message from Ms. Jakeway in which she indicated that she wanted

3

Plaintiff to leave her alone. According to Gentile's declaration, Plaintiff told him that he would have no further contact with Jakeway. (Mot. Ex. B ¶ 11 (Gentile Decl.).)

The PIS independently confirmed that on April 6, 2005, Jakeway petitioned for and was granted a temporary protective order ("TPO") in state court prohibiting Plaintiff from contacting Jakeway or their son.[1] (Mot. Ex. B ¶ 13 (Gentile Decl.), Ex. B-3 (Order of Protection), Ex. A-1 at 2 (Notice of Removal).)

Defendant sent a letter dated April 7, 2005 to Plaintiff requiring him to undergo an examination to determine his mental health status and fitness for duty. (Pl.'s Mem. Ex. "Dr Douglas PFDE.") Following the examination, the doctor reported a diagnosis of Narcissistic Personality Disorder and stated that Plaintiff "should be reminded that his maladaptive personal life is affecting his work performance," but found that Plaintiff "does not appear to be suicidal, homicidal, or psychotic," and was "psychologically fit to perform his duties as a postal employee with no accommodation." (*Id.*)

According to the "Clarification of Issues" letter attached to Plaintiff's Formal EEO Complaint, Plaintiff filed a precomplaint on May 13, 2005. (Mot. Ex. C-1 (Formal Complaint).) The record does not contain any documentation of the precomplaint. According to the Clarification of Issues letter, the precomplaint alleged race, sex, and age discrimination. (*Id.*)

According to Plaintiff's Notice of Removal, on an unspecified date, the USPS received a report that Plaintiff had allegedly violated the TPO at least three times. (Mot. Ex. A-1 at 3 (Notice of Removal).) Inspector Gentile stated in his declaration that, using the Franklin County Courtview system, he independently confirmed that Plaintiff had violated the TPO on May 4, 5,

---

[1] Plaintiff submitted a copy of a second TPO dated April 22, 2005 and expiring on October 22, 2006. (Pl.'s Mem. Ex. "Judge Mason.")

4

and 11 of 2005.[2] Gentile interviewed Jakeway regarding those violations on Thursday, May 19, 2005.[3] Gentile states in his declaration that Jakeway informed him that one of the three violations involved Plaintiff telephoning Jakeway while she delivered mail. Gentile asked Jakeway to alert the PIS and USPS management if further TPO violations occurred and advised city prosecutors for Columbus and Whitehall of the PIS's concerns for Jakeway's safety. (Mot. Ex. B ¶ 14–15 (Gentile Decl.).)

On Monday, May 23, 2005, two business days after his interview with Jakeway, Inspector Gentile met Plaintiff on his route to discuss Plaintiff's reported TPO violations. Gentile states in his declaration that "[t]his interview took place as soon after the TPO violations as was administratively possible." He further states, "[p]rior to the interview, I was unaware that [Plaintiff] had filed a discrimination claim with the EEOC." (Mot. Ex. B ¶ 16 (Gentile Decl.).)

During the interview, when Gentile asked if Plaintiff had any weapons with him, Gentile states that Plaintiff produced a switchblade knife with a three inch blade. A subsequent search of Plaintiff's assigned Postal Vehicle ("LLV") and private vehicle uncovered an additional knife with a three inch blade, a multi-tool containing a three inch knife blade, a 16 inch expandable baton, and a stun gun. (Mot. Ex. B ¶¶ 16–17 (Gentile Decl.), Mot. Ex. A-1 at 3 (Notice of Removal).)

Plaintiff filed an EEO Complaint of Discrimination in the Postal Service ("Formal Complaint") on August 10, 2005,[4] alleging discrimination based on race, color, sex, and age. Plaintiff did not check the box next to "Retaliation." The Clarification of Issues letter

---

[2] Plaintiff submitted copies of complaints filed by Jakeway in the Franklin County Municipal Court alleging that Plaintiff violated the TPO on May 4, 5, and 9, along with records of case dismissals. (Pl.'s Mem. Ex. "Judge Pollitt.")

[3] Inspector Gentile's declaration states that this interview occurred on May 19, 2009, rather than 2005. Considering the context, the Court finds this to be a typographical error.

[4] Plaintiff signed the Formal Complaint on August 10, 2005, two days after he initially mailed it.

5

accompanying Plaintiff's Formal Complaint sets forth Plaintiff's claims as relating to the alleged lack of due process given Plaintiff in the PIS investigation from April 1, 2005 through the issuance of the Notice of Removal dated July 8, 2005. (Mot. Ex. C-1 (Formal Complaint).)

The Agency's Acceptance of Formal EEO Complaint ("Acceptance Letter") was mailed to Plaintiff on August 17, 2005. The Acceptance Letter stated that Plaintiff's complaint had been accepted for investigation and provided:

> The scope of the investigation will include the following issue(s) only:
>
> Specific issue(s): The complainant alleged discrimination based on race (white), color (white), sex (male), and age (DOB: 3-17-61) when: he was denied due process during a Postal Service investigation into allegations of hostile environment harassment towards a co-worker which culminated in his being issued a Notice of Removal for Improper Conduct dated July 8, 2005.
>
> . . .
>
> If you do not agree with the defined accepted issue(s), you must provide a written response specifying the nature of your disagreement within seven (7) calendar days of receipt of this letter[.]

(Mot. Ex. C-3 (Acceptance Letter) (emphasis in original).) The record contains no evidence that Plaintiff responded to the Acceptance Letter.

Following an EEO investigation completed on October 18, 2005 (Mot. Ex. C-2), Administrative Judge Debra L. Sharpe issued a decision against Plaintiff on September 29, 2007 (Mot. Ex. D), which was affirmed by the EEOC on January 25, 2008 (Mot. Ex. E).

## II. Summary Judgment Standard

Defendant has moved for summary judgment under Civil Procedure Rule 56. Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

6

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Revis v. Meldrum*, 489 F.3d 273, 279 (6th Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Id.*, 489 F.3d at 279–80 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

## III. Discrimination Claim

In the absence of direct evidence of discrimination, a plaintiff may prove his claim through circumstantial evidence according to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, the plaintiff must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001). "Establishing a prima facie case creates a rebuttable presumption of discrimination, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the challenged employment action. If the defendant satisfies this burden, the plaintiff must then prove that the proffered reason was actually a pretext to hide unlawful discrimination." *Carter*, 349 F.3d at 273 (citations and quotations omitted). To establish such pretext, a plaintiff must show that the proffered reason (1) had no basis in fact, (2) did not actually motivate his discharge, or (3) was

7

insufficient to motivate discharge. *Id.*, 349 F.3d at 274 (citing *Seay v. TVA*, 339 F.3d 454, 463 (6th Cir. 2003)).

Plaintiff has no direct evidence of discrimination. Therefore, to establish a prima facie case, he must show that (1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was treated differently than similarly situated non-protected employees. The Court finds that Plaintiff cannot establish a prima facie case of discrimination because there is no genuine question of material fact as to whether Plaintiff was treated differently than similarly situated non-protected employees.[5]

For an employee to be similarly situated, he or she "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Parries v. Makino, Inc.*, 122 Fed. Appx. 826, 830 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. Ohio 1992)). The comparison need not involve identical misconduct, but the misconduct must be of comparable seriousness. *Id.*, 122 Fed. Appx. at 830 (citing *Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 659 (6th Cir. 1999)).

Therefore, in order to avoid summary judgment on this issue, the record must present a genuine question of material fact as to whether there is a USPS employee who (1) is outside of Plaintiff's protected group, (2) dealt with the same supervisor as Plaintiff, (3) was subject to the same standards and engaged in conduct of comparable serious to Plaintiff's conduct, and (4) was treated differently than Plaintiff. Plaintiff has not identified any employees who meet all of these

---

[5] Because the Court finds that the record does not establish a genuine question of material fact as to whether Plaintiff was treated differently than similarly situated non-protected employees, it need not reach the issue of whether Plaintiff can satisfy the first prong of a prima facie case, membership in a protected group. The Court notes, however, that because Plaintiff alleges reverse discrimination, the first prong could be satisfied if Plaintiff showed that Defendant was "that unusual employer who discriminates against the majority." *Plumb v. Potter*, 212 Fed. Appx. 472, 478 (6th Cir. 2007).

8

requirements. While he lists several employees specifically, and alleges various ways in which he believes he has been treated unfairly in comparison to those employees, Plaintiff has not alleged that any of those employees engaged in conduct that was comparable to his own alleged conduct. Plaintiff alleges the following:

(a) Jakeway (African American female) "was given Due Process to give her false statements" while Plaintiff "was totally denied Due Process to address these false statements" (Pl.'s Mem. 2–3);

(a) the following employees "were not sent for a PFDE" (Psychological Fitness for Duty Exam): Jakeway (African American female), Maggie Grove (Caucasian female), Lewis Nimmons (African American male), Donnel Kirksey (African American male), Trent Simmons (African American male), John Barker (African American male), Marvin Coleman (African American male), Joshua Collin (African American male), and Phillip Gentile (Caucasian male) (*Id.* at 3, 10–11);

(b) "all USPS employees on the rolls in 2005 were treated in a better way than [Plaintiff]" in that (i) Defendant "has no documentation of any Postal Employee who was sent for a PFDE in April 2005" and (ii) no other USPS employee was searched on May 23, 2005 (*Id.* at 3, 9, 10 (emphasis omitted));

(c) the following employees were "treated in a better way" than Plaintiff: "[t]he rural carrier in Rochester[,] New York who did not have his personal vehicle searched," "[t]he Postmaster of Lewis Center[,] Ohio who did not have his wallet emptied out to search for any incriminating evidence," and "[t]he Window Clerk in Minot[,] North Dakota who did not have her workspace searched [f]or anything that could be used in [r]etaliation" (*Id.* at 10 (emphasis omitted)); and

9

(d) Plaintiff's supervisor (Caucasian female) and station manager (African American female) generally "disciplined white men more severely and more frequently than they disciplined female [letter] carriers." (Am. Compl. ¶ 8.)

Even accepting these allegations as true, these employees do not satisfy all of the requirements to be "similarly situated." Plaintiff has not alleged that any of these employees engaged in conduct that was comparable to his own conduct, and most of the listed employees fail to meet other requirements as well, such as the requirement that they share Plaintiff's supervisor.

Because Plaintiff has not identified any USPS employees who are similarly situated to him, the record does not present a genuine question of material fact as to whether Plaintiff was treated differently than similarly situated non-protected employees. Plaintiff therefore cannot establish a prima facie case, and his claim of discrimination must fail.[6]

## IV.  **Retaliation Claim**

Plaintiff's Amended Complaint asserts a claim of "retaliation for having filed a charge of discrimination with the EEOC." (Am. Compl. ¶ 30.) While Plaintiff did not file his formal complaint with the EEOC until August 10, 2005, the parties agree that Plaintiff filed a precomplaint on May 13, 2005. (Mot. Ex. C-1; Mot. 5 (citing Am. Compl. ¶ 18).) Plaintiff alleges that Defendant retaliated against him for filing this precomplaint by conducting the May 23, 2005 inspection and by placing Plaintiff on administrative leave in June or July of 2005. (Am. Compl. ¶¶ 19, 22, 23.)

"It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be

---

[6] Even if Plaintiff could establish a prima facie case of discrimination, he has presented no evidence that Defendant's proffered legitimate, nondiscriminatory reason for action (Plaintiff's alleged misconduct) is a pretext for discrimination.

10

reasonably expected to grow out of the EEOC charge." *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001) (citing *Abeita v. Transamerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998)). Generally, a retaliation claim based on conduct that occurred after the filing of the EEOC charge can be reasonably expected to grow out of that charge. *Id.*, 250 F.3d at 342 (citing *Duggins v. Steak ' N Shake, Inc.*, 195 F.3d 828, 832–33 (6th Cir. 1999)). However, if a retaliation claim is based on conduct that occurred *before* the filing of the EEOC charge, the claim of retaliation must be explicitly included in that charge. *Id.*, 250 F.3d at 342 (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 547 (6th Cir. 1991)).

Because Plaintiff's retaliation claim is based on conduct that occurred before he filed his formal EEOC charge, this Court has no jurisdiction over that claim unless it was explicitly included in the EEOC charge. Plaintiff asserts that he "amended his EEOC charge in July 2005 to include claims that [1] the postal inspector searched him in retaliation for his having filed an EEOC charge ten days before and [2] that he was placed on administrative leave due to his race, gender, and having filed a prior EEOC charge." (Am. Compl. ¶ 23.) Plaintiff has submitted no evidence to substantiate this claim, however. The record contains no copies of Plaintiff's precomplaint or any associated amendments or other documentation. More importantly, in his official charge dated August 10, 2005, upon which this case is based, Plaintiff did not check the box next to "retaliation," and he in no way referred to retaliation on the charge document or on his "Clarification of Issues" letter dated August 10, 2005. (Mot. Ex. C-1 (EEO Compl. of Discrimination in the Postal Service).) As a result, the EEOC considered only "[w]hether or not [Plaintiff] was discriminated against based on his race and/or sex when he was issued a Notice of Removal for Improper Conducted on July 8, 2005." (Mot. Ex. D (EEOC Decision dated Sept. 29, 2007).) Because Plaintiff did not ask the EEOC to consider his retaliation claim, this Court has no jurisdiction over the claim.

### III. Plaintiff's Evidence; Due Process

Plaintiff has presented extensive evidence in the form of audio recordings and documentation which he asserts shows that Defendant treated him unfairly and denied him due process. Some of this evidence is briefly described below.

Plaintiff submitted an audio cassette tape containing recordings of what appear to be voice messages from Jakeway to Plaintiff and a meeting in the office of one of Plaintiff's supervisors. The voice messages are cordial. In one message, apparently dated March 29, 2005, Jakeway stated, "I'm glad you had time to call . . . and let me know that you made it there safe." However, in an undated message, Jakeway asked Plaintiff not to contact her. (Pl.'s Mem. Ex. Audio Recording.)

In the recorded office meeting, a woman whom Plaintiff identifies as Chanel Reedus, Acting Manager of the Whitehall post office branch, scolds Plaintiff and apparently reads to him from employee regulations. (Pl.'s Mem. Ex. "C Reedus Fire You.") The conversation is contentious. Apparently responding to inaudible interruptions, the speaker identified by Plaintiff as Reedus states:

> Guess what? [Inaudible.] I'll put you out of here. Okay? And you won't get paid. And I will try my best to fire you. You are insubordinate, you are rude, you don't treat people like human beings, and I'm tired of it.

(Pl.'s Mem. Ex. Audio Recording.)

Plaintiff also submitted more than 40 documents as exhibits to his memorandum. Some of these exhibits supplement the documentation provided by Defendant relating to Plaintiff's employment, discipline, mental health evaluation, and TPO-related litigation in state court.

Other exhibits relate to the relationship between Plaintiff and Jakeway, including phone records which, according to Plaintiff, show that he called Jakeway approximately 180 times and

12

Jakeway called him approximately 44 times between January 3 and March 28, 2005. (Pl.'s Mem. Ex. "KPB Cell Records.") Plaintiff presented written statements purportedly signed by Jakeway stating that Plaintiff has never physically harmed her or threatened to do so. (Pl.'s Mem. Ex. "CLJ No Threats.") He also submitted photographs apparently showing Jakeway and their son on March 23, 2005, when Plaintiff asserts he was in her home. Plaintiff correctly states in his memorandum that "Jakeway did not appear to be scared, harassed, threatened, nor alarmed in any way with [Plaintiff] in her house." (Pl.'s Mem. 5, Ex. "SafeAuto.")

Certain other exhibits relate to the weapons found during the March 23, 2005 search, including descriptions of similar knives, evidence that Plaintiff placed those weapons in the mail and they were delivered, and evidence that dangerous weapons are prohibited on postal service property.[7] (Pl.'s Mem. 18, Ex. "Poster 158 Tools.") Other documents relate to the use of knives against vicious dogs and an incident in 1994 when Plaintiff was attached by a pit bull on his delivery route. (Pl.'s Mem. Ex. "Pit Knife.")

Still other exhibits contain evidence of USPS policies (Pl.'s Mem. Ex. "Carrier Contract," "USPS SOP Grievance") and Plaintiff's vacation and travel between March 28, 2005 and April 10, 2005 (Pl.'s Mem. Ex. "2005 Vacation") (Pl.'s Mem. Ex. "Mastercard KPB" (appearing to show that Plaintiff was outside the State of Ohio on March 29)).

Plaintiff also submitted what he asserts is a copy of a letter sent by Plaintiff to Penni Lindsey on May 17, 2005, requesting documentation regarding the allegations against him and requesting time "to present [his] side of any alleged incidents." (Pl.'s Mem. Ex. "Request Due Process.")

---

[7] Plaintiff suggests that the fact these weapons were delivered demonstrates that they are not prohibited dangerous weapons. (Pl.'s Mem. 18.)

Finally, Plaintiff presented what appear to be excerpts of the transcript of his EEOC proceeding, evidence that Worthington is a more desirable place to work than the Hilltop area, and copies of various legal articles and case law.

In sum, Plaintiff has presented evidence attempting to support his belief that he was treated unfairly and denied due process. Most of this evidence relates to whether Plaintiff actually engaged in the conduct on which his termination was purportedly based, and much of it relates to how Plaintiff feels he was treated by Postal Service management, the PIS, and Jakeway. While Plaintiff's evidence and arguments in opposition to Defendant's motion are largely focused on an alleged lack of due process, however, Plaintiff's Amended Complaint states no due process claim. Instead, Plaintiff sued for discrimination and retaliation. While the Court must construe a pro se plaintiff's pleadings liberally, it cannot add a claim that Plaintiff has not alleged. *See Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999).

Plaintiff has submitted extensive evidence. As discussed above, however, the Court has jurisdiction over only Plaintiff's discrimination claim, and the record does not present a genuine question of material fact as to that claim.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion For Summary Judgment (Document 25) is hereby **GRANTED**. The Court directs the Clerk to enter judgment for Defendant.

**IT IS SO ORDERED.**

2-5-2010
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**